SOUTHERN LOAN AND TRUST CO. v. BENBOW.

(Filed December 2, 1902.)

1. EVIDENCE—*Fragmentary—Supplementary Proceedings—Assignments for Benefit of Creditors—Admissions.*

In an action to set aside an assignment for the benefit of creditors, a part of the evidence of the defendant, previously given in supplementary proceedings, may be introduced by the plaintiff without introducing the whole.

2. EVIDENCE—*Letter.*

A witness may refresh his recollection by a letter if he is able to guarantee that it represents his recollection at the time it was written, though he has no recollection of the facts stated therein, independent of the letter.

3. JUDGMENTS—*Estoppel—Assignments for the Benefit of Creditors—Receiver—Supplementary Proceedings—Res Judicata.*

Where a receiver in supplementary proceedings sues to recover a note as the property of a debtor, the judgment against him is not binding on any creditor, except the one who instituted the proceedings.

4. INSTRUCTIONS.

An instruction upon facts not presented by the evidence is erroneous.

DOUGLAS, J., dissenting.

ACTION by the Southern Loan and Trust Company against D. W. C. Benbow and others, heard by Judge *Thos. J. Shaw* and a jury, at December Term, 1901, of the Superior Court of GUILFORD County. From a judgment for the defendants, the plaintiff appealed.

*J. N. Wilson* and *E. K. Bryan,* for the plaintiff.
*J. T. Morehead,* and *King & Kimball,* for the defendants.

MONTGOMERY, J. The following named judgment creditors of D. W. C. Benbow, viz., the National Bank of Greens-

boro and Rowe Wiggins, the Atlantic National Bank of Wilmington, the Peoples National Bank of Lynchburg, Va., and the National Bank of Greensboro and others, and the Wilmington Savings and Trust Company, of Wilmington, N. C., the last named being a creditor whose claim was not in judgment, brought several actions against the defendant D. W. C. Benbow, and J. S. Cox, his assignee, the object of which several actions was to have a certain deed of trust executed by Benbow to Cox set aside for fraud, and to secure liens claiming priority over every other creditor, not suing before its suit was commenced, upon the property conveyed in the deed of trust to secure their several debts. The action of the first named creditor was commenced on April 13, 1894; of the second, on May 1, 1894; of the fourth, on May 14, 1894; of the fifth, on May 25, 1895; and of the third on May 1, 1894. These actions were not pressed, and nothing seems to have been done with them until the June Term, 1899, of Guilford Superior Court, when it was agreed that the first mentioned should be tried, and the others to abide the result of the first case.

An issue of fraud was submitted to the jury in that case, and found in favor of the plaintiffs; whereupon, judgment was rendered that the Wilmington Savings and Trust Company recover of the defendant, D. W. C. Benbow, its debt, the principal, interest and costs. It was further adjudged by the Court that the deed of assignment from Benbow to Cox was executed with the intent to hinder, delay and defraud his creditors, and was therefore void; and it was further adjudged that the plaintiffs in the several suits named, by reason of the bringing of said actions and the nature of the same, were entitled to and should have priority of lien on the property described in the deed of assignment over all other creditors. (The priorities of these several plaintiffs, as among themselves, were waived.)

A commissioner was appointed in said judgment to advertise and sell the property mentioned in the deed for the payment of the judgment indebtedness.    A few days before that judgment was rendered, to-wit, at a special term of the Superior Court of Guilford County, of May 22, 1899, in the case of W. H. Ragan, receiver of the property and estate of D. W. C. Benbow, against J. S. Cox, trustee, D. W. C. Benbow, Mary E. Benbow and Chas. D. Benbow, a judgment was entered that the plaintiff was not entitled to recover possession of a certain note executed by B. J. Fisher to D. W. C. Benbow, and by him transferred to his wife, Mary E. Benbow, and that the note was the property of the executor of Mary E. Benbow, who had died after the commencement of the action. The last mentioned suit of Ragan, receiver, against Cox, D. W. C. Benbow, and others, was commenced in May, 1894.    The National Bank of Greensboro, at February Term, 1894, had recovered two judgments against D. W. C. Benbow for large amounts, and, in its effort to collect the money on its judgments, supplementary proceedings were resorted to, and in those proceedings Ragan was appointed receiver of the estate and property of D. W. C. Benbow.

In the present action, the plaintiff, who was duly appointed trustee in bankruptcy of D. W. C. Benbow, brings this action as such trustee against the defendants, alleging that the deed of trust made by Benbow to Cox was executed to hinder, delay and defraud his creditors; that just before Benbow filed his petition to become a bankrupt, he had purchased the judgments against him heretofore mentioned, with his own money and effects, and procured the said judgments to be assigned to his son, the defendant Chas. D. Benbow, to defraud his creditors; and that in pursuance of this scheme, he procured the judgment of June Term, 1899, of the Superior Court of Guilford County, heretofore referred to, to be entered, by which the deed of assignment was declared void and the property conveyed in the deed condemned to be sold to satisfy the

judgment creditors named in the judgment.    The prayer for relief was that Charles D. Benbow be declared to be the owner of the judgments in trust for the plaintiff as trustee in bankruptcy of the creditors of D. W. C. Benbow, and that all the parties be restrained from selling or interfering with the property conveyed in the deed of assignment until the further order of the Court; and for such other relief as the plaintiff may be entitled to.

Afterwards the property was sold by the commissioner and purchased by Chas. D. Benbow, and the sale was confirmed, the plaintiff making a special appearance in the action for the purpose of agreeing that the proceeds of the sale should stand in the place of the property sold, and be answerable to the plaintiff for any judgment that might be obtained by it in the action.    The allegations of fraud in the complaint were denied in the answer, as was also the allegation that the defendant, D. W. C. Benbow, had purchased the judgments against himself with his own money and effects, and had them assigned to his son, Chas. D. Benbow, in fraud of his creditors.    The defendants also denied that D. W. C. Benbow caused the judgment of June Term, 1899, to be entered, and it was denied that D. W. C. Benbow had fraudulently transferred the Fisher note to the defendant Mary E. Benbow.

The following issues were submitted to the jury:

1. Was the deed of assignment executed by D. W. C. Benbow to J. S. Cox, assignee, on the 23d day of January, 1894, executed for the purpose of hindering, delaying or defrauding his creditors?

2. Was the Fisher note of $17,235 transferred by D. W. C. Benbow to his wife at a time when he was insolvent, and without valuable consideration?

3. Was the Fisher note for $17,235 transferred by D. W. C. Benbow to his wife with intent or purpose of hindering, delaying or defrauding his creditors?

4. Were any of the judgments mentioned in the complaint, to-wit, the Peoples National Bank, of Lynchburg, the National Bank of Greensboro, J. Davenport, Jr., the First National Bank of Richmond, the Union Bank of Richmond, Miss Rowe Wiggins, the Atlantic National Bank of Wilmington, the Wilmington Savings and Trust Company, of Wilmington, the Bank of Guilford, purchased with the money derived from the Fisher note, or any part thereof, and if so, which judgment or judgments, naming them?

5. Did defendant D. W. C. Benbow purchase the judgments mentioned in the complaint and have the same assigned to Chas. D. Benbow, for the purpose of hindering, delaying or defrauding his creditors?

6. Was the decree in the creditors' suits, condemning the property of D. W. C. Benbow to the payment of the judgments taken after filing of the petition in bankruptcy by D. W. C. Benbow, without the trustee in bankruptcy having been made a party?

7. In an action heretofore tried in this Court, wherein W. H. Ragan, receiver of the property of D. W. C. Benbow, appointed in supplementary proceedings instituted by the National Bank of Greensboro and the Bank of Guilford, creditors of Benbow, against J. S. Cox, trustee, Chas. D. Benbow, executor of Mary E. Benbow, deceased, D. W. C. Benbow, and others—was it found as facts by the jury (1) that assignment and transfer of the due bill of B. J. Fisher by D. W. C. Benbow to Mary E. Benbow was not made to obstruct, hinder and delay or defraud the creditors of said D. W. C. Benbow; (2) that said transfer and assignment were not invalid for any other reason, and did the Court upon such verdict adjudge that Chas. D. Benbow, as executor of Mary E. Benbow, was the legal owner of said note?

On the trial, the plaintiff offered to read in evidence that part of the examination of D. W. C. Benbow, in the supple-

mentary proceedings, which concerned the Fisher note, for the purpose of showing that there was no valid consideration to support the transfer of that note from said Benbow to Mary E. Benbow, his wife; and he also offered to introduce and read that part of Mrs. Benbow's evidence in the supplementary proceedings. His Honor refused to allow those parts of the evidence of Benbow and his wife to be read, the defendants objecting on the ground that those parts of the evidence were fragmentary, and that the entire record of all their evidence had to be offered. We think that the evidence ought to have been admitted.

We know that, to arrive at the true meaning of a person's declaration or admission, we must hear all and each part of that declaration or admission. We can not arrive at the true meaning by taking detached parts of an admission or declaration unfavorable to the declarant, and leave out the part or parts which might be explanatory and favorable. Mr. Greenleaf, in his first volume on evidence (16th Ed.), section 201, says: "This general principle, however, raised two sorts of questions; first, whether the party offering the admission *must*, as a preliminary condition, put in the whole or other parts of the conversation, document, etc.; second, whether the party whose statement it is *may* afterwards, by way of explanation, put in the other parts or other statements. It does not seem to be generally required that the party offering the admission must put in, at the same time, any more than that which he desires to use—whether a speech, or conversation, or a writing." The same rule is laid down in *Gossler v. Wood,* 120 N. C., 69; *Roberts v. Roberts,* 85 N. C., 9.

We have said that his Honor was in error in excluding the evidence, even though it was only a part of the evidence of the defendants on the question of the consideration upon which the Fisher note was transferred to Mrs. Benbow. In looking at the entire evidence of the defendants, given in the supple-

mentary proceedings, the part offered was about all that was said on the subject. The plaintiff put the whole evidence in, after his Honor refused to allow the parts which were offered to be read, reserving his exception. The evidence was lengthy, and covered many questions and many other matters of alleged fraud, and was calculated to mislead the jury. For the purpose of showing that the defendant D. W. C. Benbow purchased the judgments against himself with his own money and effects, the plaintiff offered to show by R. R. King that D. W. C. Benbow purchased these judgments. A letter signed by King was shown to him, in these words: "No. 7, Raleigh, N. C., January 30, 1899. Mr. Chas. U. Williams, Richmond, Va.: Just before leaving home this a. m., (Dr. Benbow asked me to write and ask you to have the notes of the Union Bank and others on North State Improvement Company, sent to the Greensboro National Bank, of Greensboro, to be delivered to him when he pays balance) of suit on compromise. I suggest that you accompany these with a statement showing balance, and saying that all Court costs must be arranged also. I expect to return home on next Thursday. (Benbow says he wants to pay you at once.) Am here getting Legislature to repeal some repudiation legislation enacted at two last sessions. Yours truly, R. R. King."

The witness said that he had no recollection of writing that letter, nor of what it contained independent of the paper itself. He was further asked these questions: "After looking at that paper, can you state whether you wrote it or not?" He answered, "This paper says so, but independent of that I have no recollection." He was asked again, "Did you write that letter?" "I think that is my handwriting." There were four or five other letters of the same nature shown to the witness, and he made the same statement about them all. When asked about one of the letters, if any statement in that paper is true, he answered, "Yes, I need not repeat that."

It is to-day generally understood that there are two sorts of recollection which are properly available for a witness, to-wit, past recollection and present recollection. In the latter and usual sort, the witness either has a sufficiently clear recollection, or can summon it and make it distinct and actual, if he can stimulate and refresh it, and the chief question is as to the propriety of certain means of stimulating it—in particular of using written or printed notes, memoranda or other things, as refreshing it. In the former sort, the witness is totally lacking in present recollection; and can not revive it by stimulation; but there was a time when he did have a sufficient recollection, and when it was recorded, so that he can adopt his record of his then existing recollection, and use it as sufficiently representing the tenor of his knowledge on the subject. First, the record memorandum, note, entry, etc., must have been made at or *about the time* the event recorded. Whether in a given case it was made so near that the recollection may be assumed to have been then sufficiently fresh must depend on the circumstances of the case. Second, the witness need not have made the record himself; the essential thing is that he should be able to guarantee that the record actually represented his recollection at the time, and this he may be able to do either by virtue of his general custom in making such records, or by his assurance that he would not have made the record if he had not have believed it correct. Greenleaf on Evidence, Sec. 439 (a), 439 (b).

The witness said, in reference to the time and date of the letter, "I have no recollection independent of that, and I have no recollection of writing that letter, and have no recollection of any of the matters therein referred to. At about that period, and subsequent thereto, I had a great many conversations with Dr. Benbow about these matters, and with his counsel." Applying all these tests laid down by Mr. Greenleaf to the testimony of the witness, we think that it was competent, and ought to be received.

His Honor instructed the jury that the plaintiff could bring his action and have the questions involved therein determined and passed upon by the jury, and "that you will not permit the answer to the last issue, which relates to the decree of the Court in the case of Ragan, receiver, against Cox, trustee, and others, to influence you in passing upon the second, third and fourth issues, or any of the issues, so far as that is concerned." The defendants did not appeal from that instruction, but in the argument here it was contended that the Court which tried the case upon the pleadings was without jurisdiction of the subject matter of the action. It was argued that Ragan was a receiver appointed in supplementary proceedings, and therefore he represented the creditors of D. W. C. Benbow, and that in his suit to recover possession of the Fisher note, there was a judgment against him and in favor of Mrs. Benbow, and therefore that the creditors were bound by that judgment. But the supplementary proceedings in which Ragan was appointed were not in a general creditor's bill properly constituted, but in a single creditor's suit, in which the creditor was trying to enforce his own particular demand.

The judgment, therefore, bound none of the creditors, except that one who instituted the supplementary proceedings in his own behalf and not for the other creditors.

It was argued also, here, that on the main branch of this suit the five judgment creditors named were proceeding in behalf of themselves and all other creditors of D. W. C. Benbow, to set aside the deed of trust, and to subject the property conveyed therein to the payment of the debts due to all the creditors. But the fact is, as we have already seen, there was no general creditors' bill, but there were five separate suits, and they were never even consolidated. One was tried, with an agreement on the part of the other four that they would abide the result of the trial.

While the charge of his Honor is, in the main, correct, we

think in one serious particular there was an error, which was excepted to by the plaintiff. It was on the question of the consideration for which the note of $15,000, made in 1890, was given by Dr. Benbow to his wife, and which was afterwards alleged to have been credited with the Fisher note, which had been assigned by Dr. Benbow to his wife. The substance of Dr. Benbow's testimony was about this: "The Fisher note is in the National Bank of Greensboro. It was not delivered to Cox, assignee, because I had transferred it to my wife by endorsement, on January 22 last, the day before my assignment. I made this transfer to her as a credit upon a note she held against me for a larger amount, leaving a balance of $715 and accrued interest. The note held by my wife was dated September 1, 1893, and that was the true date, it being a renewal of one given a year previous, that was a renewal note which was also given as a renewal note for one given in March or April, 1890, which was the first note. The amount of the first note was about $15,000. The consideration of the note given in 1890 was a gift based upon a calculation of money belonging to her, given to her by her father; this money was not willed to her by her father, but given to her before her father's death. I was married in 1857. This money was the proceeds of sale of negroes, which her father sold, and amounted to $2,500, and the money was given to her at different times before the war, and she gave it to me when her father gave it to her. I account for the difference between the $2,500 and the $15,000 by the addition of interest at six per cent. These notes to my wife were kept in my safe, and they were never out of my possession. When the transfer of the Fisher note was made, she immediately returned it to me. This Fisher note is a due bill."

He was solvent when he executed the $15,000 note, and he said that he gave it to her from the fact that she had asked him on several occasions to give her, in her own right, a home. He further said, that before 1890, Mrs. Benbow repeatedly

urged him, in consideration of her having furnished him the $2,500, to purchase and settle upon her a home, and that he recognized the justice of her claim, but that he had no suitable property himself for the purpose, so he executed to her the note for $15,000, and that that amount was made by the addition of interest from the time she let him have the money.

Mrs. Benbow's evidence was, in substance, as follows: "I had, for several years before the spring of 1890, insisted upon Dr. Benbow's giving me property to be my own, particularly a home and its appurtenances, which he had from time to time promised to do, particularly when he asked me to join in two mortgages for $25,000, each to enable him to borrow money to use in his business as a stockholder in the North State Improvement Company. He promised me as soon as that was paid off he would comply with my request. In the early spring of 1890, he came to me at the head of the dining room and told me he was now out of debt; that he had no real estate of his own that was suitable for a residence for me, and had concluded to give me the money with which to purchase me a home, and in addition thereto, for such other purposes as I wished to use it. He handed me his note or due bill for, as near as I can remember, about $15,000, which I took. Several times since he has told me that he renewed it at the end of each year, including the accrued interest. On the 22d of January last, as a payment on said note, Dr. Benbow transferred to me the note spoken of in his examination as the Fisher note. Which payment he endorsed by way of credit on my note."

As we have said, the note for $15,000 was executed in 1890, when Dr. Benbow was solvent. The Fisher note was alleged to have been paid as a credit on it, when he was insolvent and the day before he made his assignment.

His Honor properly told the jury that when Dr. Benbow received $2,500 in money from his wife before the war, it became his, and if that was the only consideration for the exe-

cution of the $15,000 bond, that the said note was not a valid debt of Dr. Benbow as against his creditors, and that if the jury found from the evidence that the Fisher note was transferred to Mrs. Benbow as a payment upon the note, if based upon such consideration, the transfer was without a valuable consideration, and they should answer the second consideration "Yes." But he instructed the jury that if they should find from the evidence that Mrs. Benbow joined with Dr. Benbow in the execution of two certain mortgage deeds for $25,000 each, and that at the time it was agreed between her and Dr. Benbow that if she would sign the same he would give her a home, and that afterwards, in 1890, it was agreed between him and his wife that in place of a home he would give her his note for $15,000, with which to purchase a home, and pursuant to that agreement he executed and delivered to her his note, and that he transferred to his wife the Fisher note as a payment on his note to his wife, and she had accepted it as such, then such a transfer of the Fisher note would be for a valuable consideration, and they should answer the second issue "No." And he further charged, if you should find that the $15,000 note was not given to her in consideration of any former promise to give her a home, if she would sign the mortgage deed, or if the jury should find from the evidence that there was no agreement between Benbow and his wife at the time of the execution of the mortgages before referred to, to the effect that if she would sign the mortgages he would give her a home, or if they should find that the mortgage deeds were never signed by Mrs. Benbow, then there was no valuable consideration for the transfer of the Fisher note. There was error in that part of the charge.

There is no evidence that the signing of the mortgage deeds by Mrs. Benbow was the consideration for the promise.

New Trial.

Douglas, J., dissenting.